UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SHELIA D. HOLMES BULLOCK           CIVIL ACTION

VERSUS                              NO:  06-1792-ILRL-SS

JO ANNE BARNHART, COMMISSIONER OF
SOCIAL SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

The plaintiff, Sheila D. Holmes Bullock ("Bullock"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).  Rec. doc. 1.

## PROCEDURAL HISTORY

On January 5, 2004, Bullock submitted an application for benefits.  R. 42-44.  She reported that she became unable to work on September 12, 2003.  R. 42.  She described her disabling conditions as advanced osteoarthritis in her right knee, high cholesterol, high blood pressure, panic attacks and sleep disorders.  R. 52 and 89.  Her application for benefits was denied.  R. 22-25.  There

was a hearing before an Administrative Law Judge ("ALJ") on March 31, 2005. R. 197-217. On

November 21, 2005, the ALJ issued an unfavorable decision. R. 10-19. On March 21, 2006, the

Appeals Council denied Bullock's request for review. R. 5-8. On April 7, 2006, she filed a

complaint in this Court. Rec. doc. 1. The parties filed cross-motions for summary judgment. Rec.

docs. 11 and 12. Bullock was represented by counsel throughout these proceedings.

## STATEMENT OF ISSUES ON APPEAL

Bullock's request for judicial review raises the following issues:

1.      Did the ALJ err in not finding that Bullock met the listing requirements for Section 1.02A-Major dysfunction of a joint?

2.      Did the ALJ improperly reject the opinion of Bullock's treating orthopedic surgeon?

## THE ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.      The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in section 216(i) of the Social Security Act through December 31, 2008.

2.      The claimant has not engaged in substantial gainful activity since September 12, 2003 (20 CFR §§ 404.1520(b) and 416.920(b)).

3.      The claimant has the following severe impairments: status post right knee arthroscopy with residual degenerative arthritis and popliteal cyst, degenerative arthritis of the left knee, hypertension, hyperlipidemia, obesity and situational anxiety (20 CFR §§ 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR §§ 404.1520(d) and 416.920(d)).

5.      The claimant has the residual functional capacity to perform a range of sedentary work activity with the ability to sit up to six hours a day, with a sit/stand option, walk up to two hours a day, with no climbing activities and avoidance of environments exposing claimant to concentrated heat and noise.

2

6.      The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

7.      At the time of the alleged disability onset date, claimant was a younger individual age 45-49 (20 CFR §§ 404.1563 and 416.963).

8.      The claimant has a high school education and two years of college studies (20 CFR §§ 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR §§ 404.1560(c) and 416.960(c) and 416.966).

11.     The claimant has not been under a "disability" as defined in the Social Security Act, at any time from September 12, 2003 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

R. 15-19.

## ANALYSIS

a.      Standard of Review.

        The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute

3

its judgment for the Commissioner's.  Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry

---

[1] The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).
Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).
Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d),

terminates if the Commissioner finds at any step that the claimant is or is not disabled.  <u>Leggett v.</u>

<u>Chater</u>, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  <u>Id</u>.  If she

successfully carries this burden, the burden shifts to the Commissioner to show that other substantial

gainful employment is available in the national economy, which the claimant is capable of

performing.  <u>Greenspan</u>, 38 F.3d at 236; <u>Kraemer v. Sullivan</u>, 885 F.2d 206, 208 (5th Cir. 1989).

When the Commissioner shows that the claimant is capable of engaging in alternative employment,

"the ultimate burden of persuasion shifts back to the claimant." <u>Id</u>.; accord <u>Selders</u>, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial

evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and

examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age,

education, and work history."  <u>Martinez v. Chater</u>, 64 F.3d 172, 174 (5th Cir. 1995).  "The

Commissioner, rather than the courts, must resolve conflicts in the evidence." <u>Id</u>.

b.    <u>Testimony at Hearing</u>.

Bullock had arthroscopic surgery on her right knee on September 12, 2003.  R. 200-01.

After the surgery she improved.  Her doctor said she could return to work on November 10, 2003.

---

416.920(d).

       Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  <u>Id</u>. §§ 404.1520(e), 416.920(e).

       Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  <u>Id</u>. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  <u>Id</u>. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

R. 201.  She worked as a nursing assistant, lifting and transferring patients. She began to have severe

pain in her right knee after the surgery.  She was told to stop her nursing work.

When the pain became worse, she stopped working on January 6, 2004.  R. 201.  On that day

she returned to her doctor, who drained fluid from her knee.  R. 201-02.

When she stopped working, she lost her health benefits.  She began going to Charity

Hospital.  In March 2004, a cane was prescribed.  R. 202 and 213.  In June 2004, she received an

injection of cortisone.  R. 203.  It helped for about three months.  R. 203.  She continued to

experience fluid buildup in the knee.  R. 203.  Her doctors exhausted all options for conservative

treatment and her only option was a knee replacement.  R. 204.  If she was awarded benefits, she

would seek a knee replacement and after a recuperative period, try to return to the work force.  R.

204.

At the time of the hearing Bullock had difficulty climbing stairs.  R. 199.  If she went up five

or more steps, her leg became weak and it would almost give out on her.  R. 200.  She needed to use

a handrail when she was on stairs.  R. 200.  She could not walk a great distance.  R. 205.  She could

not walk a block on an uneven surface at a reasonable pace, because her knee would give out.  R.

205.  She could not mop or cook. R. 205.  She could not stand for very long.  R. 205.  Because of

the problems with the right knee, she was starting to experience problems with her left knee.  R. 205.

She experienced pain in the right knee every day.  R. 205.  There was a burning sensation in her

right leg.  R. 206.  Without medication the pain was excruciating, but with Vicodin it was moderate.

Id. The Vicodin caused itching that was controlled with Benadryl.  R. 206.  She could not work with

the medication, because it sedated her.  R. 207.

She spent most of her time in bed with her leg propped up.  R. 207.  She stayed inside at the

computer.  R. 207.  She used medication to help her sleep at night.  R. 208.

      In response to the ALJ's hypothetical question, the vocational expert reported that Bullock would not be able to return to her past relevant work as a certified nursing assistant or private duty nurse.  R. 209.  She would be able to perform sedentary jobs, for example as a cashier or receptionist.  R. 209-10.  The hypothetical question was modified and she was restricted to occasionally lift and carry ten pounds; carry less than ten pounds frequently; stand and walk for two hours in an eight hour day; sit for six hours; unlimited pushing and pulling; never climb; and occasionally kneel, crouch and crawl.  With these restrictions the expert testified that she could perform sedentary activities and there were jobs available.  R. 210.  It would not be necessary for her to tell her employer that she was on Vicodin.  R. 212.  If she was required to keep her leg elevated for several hours a day, it would be difficult for her to sustain employment.  R. 210-11.  If she had to lie down during the day, there were no jobs available.  R. 211.

      Bullock's counsel urged that she met the requirements for Section 102.A listing.  The ALJ questioned this conclusion.  R. 213.  Bullock's counsel referred to the report by Dr. Mark Meyer, an orthopedic surgeon at Ochsner, and urged that Dr. Meyer found all of the elements for listing 102.A.  R. 213-16.  The ALJ reported that Bullock would be sent to an orthopedist.  R. 216.

c.    <u>Medical Evidence</u>.

      On October 17, 2002, Bullock was seen at Ochsner by Dr. Stephen Gergatz, an internist and her primary care physician with complaints of left knee pain.  She reported that she had taken Celebrex for couple of weeks without relief.  There was fluid and swelling in her left knee.  R. 126-27 and 166.  On October 25, 2002, she was seen by Dr. Barbagelott, an orthopedist at Ochsner, for pain in her left knee that had been present for about three weeks.  She was diagnosed with early

degenerative joint disease and a Baker's cyst.  R. 124-25.

On January 29, 2003, she was diagnosed by Dr. Gergatz with pain in both knees and cysts behind both knees.  R. 122-23.  On January 30, 2003, she returned to Dr. Barbagelott with reports of pain in her right knee.  She was diagnosed with mild degenerative joint disease and an associated Baker cyst.  R. 120.  The doctor reported that she was involved in patient care.  She stood all day and she did a lot of heavy lifting.  She was slightly overweight, so there was a lot of stress on her knees.  She liked to work hard and the condition interfered with her job.  She was given an injection in her right knee with the recommendation that she take an anti-inflammatory medication.  R. 120-21.

On June 16, 2003, she was seen by Dr. Gergatz for complaints of high blood pressure.  R. 118.  On August 5, 2003, she was diagnosed by Dr. Barbagelott with degenerative joint disease of the knee and a large symptomatic popliteal cyst.  An MRI was ordered.  She was to be evaluated by an orthopedic surgeon.  R. 117.

On August 14, 2003, Bullock was seen by Dr. Mark Meyer, an orthopedic surgeon at Ochsner, for complaints of pain in her right knee and swelling.  An MRI revealed a significant popliteal cyst and degenerative changes in the posterior horn of the medial meniscus.  R. 116.  He reported to her that Ochsner did not do surgical excisions in these situations because the recurrence rate was so high.  He recommended aspiration and an injection.  R. 112-13.

On August 25, 2003, she sought a second opinion from Dr. Charles Johnson at Doctors Hospital in Jefferson based on the severe pain she was experiencing in her right knee.  R. 170.  On September 12, 2003, Dr. Johnson performed arthroscopic surgery on her right knee with partial medial meniscectomy.  Her right knee was injected with celestone.  R. 97.  On September 24, 2003,

8

she was seen by Dr. Johnson and told to return in three weeks.  R. 131.  On October 15, 2003, Dr. Johnson injected her knee with cortisone.  R. 131.  On November 10, 2003, Dr. Johnson reported she was doing well from the surgery.  She wanted to return to work and was cleared to do so.  R. 130.  On November 21, 2003, Dr. Johnson injected the right knee and excised a lipoma on the right thigh.  R. 167.  On December 4, 2003, he found the surgical wound well healed.  Her right knee was doing quite well with a good range of motion.  R. 128.

On December 11, 2003, Bullock was seen by Dr. Gergatz for a follow-up for her blood pressure.  She took antihypertensive medication.  She reported that her right knee pain was more painful than before the surgery.  R. 110.

On January 6, 2004, Dr. Johnson reported that she had a massive effusion in her right knee. It was drained and injected.  R. 128.  Dr. Johnson reported that she was unable to return to work until further notice.  R. 169.  On March 8, 2004, she telephoned Dr. Johnson's office and reported that her right knee was swollen and she was in pain.  She did not have health insurance.  R. 168.

On March 17, 2004, she was seen at Charity Hospital for complaints of knee pain.  R. 162. Darvocet and Motrin were prescribed.  R. 164.  On April 1, 2004, Charity's orthopedic department prescribed a cane.  R. 160.  On April 6, 2004, she was seen at Charity's orthopedic department for complaints of right knee pain.  R. 164.  X-rays revealed degenerative changes in both knees.  The right knee had small joint effusion and a Baker's cyst.  R. 159.

On June 9, 2004, Bullock returned to Dr. Meyer, the orthopedic surgeon at Ochsner.  She wanted to avoid a knee replacement.  She was given an injection of Kenalog and Lidocaine into the right knee.  R 154.  On June 11, 2004, she was seen by Dr. Gergatz because of persistent pain in her right knee.  She reported considerable stress from the death of her husband.  R. 151.

9

On July 8, 2004, Dr. Gergatz reported that he considered Bullock disabled. She was diagnosed with hypertension, hyperlipidemia and osteoarthritis. After the surgery on her right knee, the conditions recurred. She was overweight. R. 166.

On October 11, 2004, she returned to Dr. Meyer with complaints of right knee pain. She had exhausted the conservative treatment options. The only remaining treatment was a knee replacement, but she had no insurance coverage. She was given a prescription for Vicodin. R. 150.


On November 1, 2004, she was seen by Dr. Gergatz with complaints of depression after her husband's death. She reported suicidal thoughts and persistent pain in her right leg. R. 147. On December 29, 2004, she returned to Dr. Gergatz with an upper respiratory infection. R. 144-45. On February 28, 2005, she complained to Dr. Gergatz of depression, fatigue and nausea and pain in her right let. She had not recovered from the knee surgery and she was unable to afford the orthopedist. Medication was prescribed. R. 142-43.

On March 28, 2005, Dr. Meyer reported that he first saw Bullock on June 17, 2004, with complaints of severe pain in the right knee. When she returned on October 11, 2004, radiographs revealed advanced osteoarthritis of the right knee with complete loss of the articular cartilage in the medial half of the knee. The only treatment available was a knee replacement. With the advanced arthritic changes in her knee, she had a significantly impaired ability to ambulate. It would be difficult for her to walk significant distances, perform stair climbing or walk on uneven surfaces. R. 172. On April 11, 2005, he completed a narrative report. He described her condition as "bone on bone" in the medial compartment of the right knee. He believed she met the criteria for a major dysfunction of her knee joint. Due to the advanced arthritis, she had lost the function of her leg.

She met the criteria for being unable to ambulate effectively.  She was unable to walk long or medium length distances.  She had osteoarthritis in the left knee, but it was not as advanced as the condition in the right knee.  R. 181.  He would not consider it unusual for her to be unable to walk one block at a time, particularly on rough or uneven surfaces and he expected her to have difficulty with climbing stairs.  R. 182.

On May 24, 2005, she was seen by Dr. Donald Faust, an orthopedic surgeon, for a consulting examination.  He found that she was active and independent and able to care for herself.  She would have problems with prolonged walking or standing, but could perform sedentary type activities.  R. 173-75.

d.    Plaintiff's Appeal.

Issue no.1.    Did the ALJ err in not finding that Bullock met the listing requirements for Section 1.02A-Major dysfunction of a joint?

Bullock contends that the record evidence conclusively establishes that her impairment meets the requirements for Listing 1.02A.  She cites:  (1) the results of the MRI done before her arthroscopic surgery; (2) the surgery; (3) problems with the right knee after the surgery; and (4) the reports of her physicians after the surgery, in particular the reports of Dr. Meyer.  Rec. doc. 11 at pp. 7-10.  The Commissioner contends that:  (1) Bullock did not satisfy the diagnostic criteria for Listing 1.02A; and (2) assuming such criteria were satisfied, she did not demonstrate an inability to ambulate effectively as described in Listing 1.00B.2.b.  The ALJ found that Bullock did not have an impairment that met or medically equaled one of the listed impairments.  R. 16.

Listing 1.02A is a major dysfunction of one major peripheral weight-bearing joint, for example the knee, resulting in an inability to ambulate effectively.

(It is) [c]haracterized by gross anatomical deformity (e.g. subluxation,

11

contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint(s).

20 C.F.R. part 404, subpart P, app. 1. section 1.02A.[2]

On August 7, 2003, an MRI of the right knee that revealed: (1) a complete rupture of the anterior cruciate ligament; (2) degenerated and torn posterior horn of the medial meniscus; (3) supra patellar effusion; (3) a large Baker's cyst; and (5) probable chronic tear of the medial collateral ligament. R. 116. Bullock was seen by Dr. Meyer on August 14, 2003. He described the x-rays as revealing mild degenerative changes and the MRI as revealing a large popliteal cyst across the medial aspect of the knee and a torn medial meniscus. R. 112-13. His impression was a painful popliteal cyst. R. 112. During the physical examination, she walked with a normal gait. The examination of the knees revealed a normal valgus alignment. R. 112.

After the surgery and after she had been cleared to return to work, Dr. Johnson saw Bullock on December 4, 2003. She had a good range of motion with minimal crepitus. R. 128. When she returned to Dr. Johnson on January 6, 2004 she had a massive effusion on her right knee that had to be drained. She was unable to return to work. R. 128 and 169.

April 6, 2004 x-rays from Charity revealed: (1) degenerative changes in both knees, (2) mild joint effusion within the right knee; and (3) a Baker's cyst. R. 159.

Bullock's saw Dr. Meyer on June 9, 2004. She reported that her pain was worse than it was before the September 2003 surgery. She denied any feelings of popping or clicking or frank

---

[2] Subluxation is defined as an incomplete luxation or dislocation; though a relationship is altered, contact between joint surfaces remains. Stedman's Medical Dictionary (26th Ed. 1995), p. 1693. Contracture is defined as static muscle shortening due to tonic spasm or fibrosis, or to loss of muscular balance, the antagonists being paralyzed. Id. at p. 389. Ankylosis is defined as stiffening or fixation of a joint as the result of a disease process, fibrous or bony union across the joint. Id. at p. 93.

instability.  She localized her pain throughout the right knee.  The examination revealed that the surgery was well healed.  The cyst was not as frankly palpable as before the surgery.  X-rays revealed moderate to advanced osteoarthritis of the right knee.  R. 154.  On her last visit to Dr. Meyer on October 11, 2004, the range of motion was 0 to 105 degrees.  R. 150.

Six months later Bullock was seen for a consultative examination with Dr. Faust.  The range of both knees was from 0 to 100 degrees.  There was creptance on the right but not on the left.  X-rays revealed mild degenerative changes.  R. 173-75.

There was no diagnosis of subluxation, contracture, bony or fibrous ankylosis or instability in these records.  Nor do the records reveal any other gross anatomical deformity.  Thus, the record does not demonstrate that Bullock satisfied the diagnostic criteria for Listing 1.02A.  Assuming for the moment that she did, the issue would be her ability to ambulate effectively.

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.   Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R.  part 404, subpart P, app. 1. section 1.00B.2.b.(1).  The record demonstrates that Bullock was able to ambulate without the use of a device like a walker or other hand-held device that limited the functioning in both upper extremities.  She was only required to use a cane.  R. 202 and 213.

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment. . .  Therefore, examples of ineffective ambulation, include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single

hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R.  part 404, subpart P, app. 1. section 1.00B.2.b.(2).

On April 11, 2005, Dr. Meyer said:

I believe she meets the criteria of the inability to ambulate effectively because of the symptoms created with weightbearing and her inability to walk long or medium length distances. . . .  Based on her radiographs and failure to respond to conservative treatment, I would consider it not unusual for her to not be able to walk one block at a time, particularly on rough or uneven surfaces. . . .

R. 181-82.  Dr. Faust, however, reported that Bullock stated she could not walk more than two blocks.  R. 173.

The medical and record evidence demonstrates that Bullock was not required to use a walker or two canes to walk.  She used one cane.  R. 202.  When she applied for benefits, she reported that she lived at home and cared for her husband, who had active lung cancer.  She assisted him with his daily activities.  She prepared easy, fast meals on a daily basis.  She was able to do laundry and limited cleaning every other day.  She brought her husband to his medical appointments and chemotherapy.  She did limited grocery shopping about once a month.  She was able to drive a car. She was able to go out alone.  R. 79-86.  She testified that she could climb a few stairs using a hand rail.  R. 200.  Bullock's contention that she meets the listing rests on Dr. Meyer's statement concerning her inability to walk a block over a rough or uneven surface.  In contrast, it was Dr. Faust's opinion that she probably would have no problems with prolonged walking.  R. 175.  There was substantial evidence to support the ALJ's determination that she did not meet requirements for Listing 1.02A.

Issue no. 2.  Did the ALJ improperly reject the opinion of Bullock's treating orthopedic surgeon?

14

Bullock argues that the ALJ improperly rejected Dr. Meyer's opinion.  Dr. Meyer was the orthopedic surgeon who saw Bullock both before and after Dr. Johnson at Doctors Hospital performed arthroscopic surgery on her right knee.  After the surgery, Dr. Meyer saw her on two occasions:  June 9, 2004; and October 11, 2004.  R. 150 and 154.  Dr. Meyer supplied "To Whom it May Concern" reports immediately before and after the hearing before the ALJ.  R. 172 and 181-82.  At the close of the hearing and in conjunction with discussion with counsel for Bullock as to whether she met the requirements for Listing 102.A, the ALJ reported she would be sent to another physician for a consultative examination.  She was seen by Dr. Faust on May 24, 2005, who furnished a report and completed a medical assessment of her physical ability to do work-related activities.  R. 173-78.

The ALJ cites the opinions of Dr. Meyer and Dr. Faust at pages 16 and 17 of his decision.  He reports that significant weight was given to Dr. Faust's opinion that Bullock could perform sedentary work activity with no prolonged walking or standing.  R. 16.  He did not find that Bullock's description of the intensity, duration and limiting effect of her symptoms was entirely credible.  R. 17.  The ALJ described his review of the medical evidence as not demonstrating a longitudinal history of consistent symptoms which would prohibit the performance of all work activity.  R. 17.  The ALJ cited Dr. Meyer's report of Bullock's last visit to him on October 11, 2004, where he noted that she had exhausted all conservative treatment.  The ALJ reports that after the October 11, 2004, there is no record of Bullock returning to Dr. Meyer for further treatment.  After a five month gap in treatment, Dr. Meyer issued his April 11, 2005 "To Whom It May Concern" letter, in which he reported that Bullock was disabled and she met the criteria major dysfunction of the knee joint.  R. 17 and 181-82.  The ALJ repeats the statement that greater weight

was given to Dr. Faust's opinion.  R. 17.

In <u>Newton v. Apfel</u>, 209 F. 3d 448, 453 (5th Cir. 2000), the Fifth Circuit said,

> The Court concludes that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).

<u>Id</u>. at 453.  In <u>Beasley v. Barnhart</u>, 2006 WL 2062101 (5th Cir. July 25, 2006), the ALJ adopted the evaluation of the non-examining medical consultant and rejected the opinion of the claimant's treating  psychiatrist.  The Fifth Circuit, citing <u>Newton</u>, found that the ALJ was required to make an analysis of the § 404.1527(d) factors, because the medical consultant never examined or treated the claimant.  Inasmuch as Dr. Faust expressed his opinion after a physical examination of Bullock, there was reliable medical evidence controverting Dr. Meyer's opinion.  The ALJ was not required to make the § 404.1527(d) analysis.

Bullock complains that the ALJ did not ask Dr. Faust to determine whether she met the requirements for Listing 102A.  Dr. Faust, however, was asked to examine Bullock and provide a medical assessment of her ability to do work-related activities, all of which he did.  R. 173-78.  Bullock also complains that Dr. Faust did not review all of her medical records.  This is without merit.  Dr. Faust's report of Bullock's history cites the pertinent events after her surgery, including the recommendation by Dr. Meyer for a knee replacement.  R. 173.

The ALJ reviewed all of the medical evidence and determined that greater weight should be given to the opinion of Dr. Faust, an examining consulting physician, than to Dr. Meyer's opinion.  R. 16-17.  This was his prerogative under <u>Newton</u>.  This court may not re-weigh the evidence or substitute its judgment for the Commissioner's.  <u>Carey</u>, 230 F.3d at 135.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 12) be GRANTED and Bullock's motion for summary judgment (Rec. doc. 11) be DENIED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 6th day of November, 2006.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**

17